**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Energy Future Holdings Corporation, <u>et al.</u>, | Case No. 14-      (---) |
| Debtors. | Joint Administration Pending |
| | **Objection Deadline: TBD**<br>**Hearing Date: TBD** |

**MOTION OF WILMINGTON SAVINGS FUND SOCIETY, FSB PURSUANT
TO 28 U.S.C. §§ 1408 & 1412 AND RULE 1014 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE TO TRANSFER CASES TO THE UNITED
STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS**

Wilmington Savings Fund Society, FSB (the "<u>Trustee</u>"), as successor trustee under that certain indenture, dated as of October 6, 2010 (as amended or supplemented), among Texas Competitive Electric Holdings, LLC ("<u>TCEH</u>"), TCEH Finance, Inc., the guarantors party thereto, and The Bank of New York Mellon Trust Co., N.A., as trustee (the "<u>Indenture</u>"),[1] pursuant to 28 U.S.C. §§ 1408 and 1412, Rule 1014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Section 105(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), hereby moves this Court (the "<u>Motion</u>") to transfer the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") of Energy Future Holdings Corporation ("<u>EFH</u>") and its subsidiaries (together, the "<u>Debtors</u>") to the United States District Court for the Northern District of Texas in the interests of justice and/or for the convenience of the parties.  In support of this Motion, the Trustee respectfully represents as follows:

---

[1]     As used herein, the terms "<u>Second Liens</u>" or "<u>Second Lien Notes</u>" refer to the senior secured second lien notes issued pursuant to the Indenture.

## PRELIMINARY STATEMENT

1.      It is settled law in this District that the Court may, in the interests of justice <u>or</u> for the convenience of the parties, transfer venue of a pending chapter 11 case to another proper district.  Without in any way suggesting that this Court would be unable to adequately administer the Chapter 11 Cases, the Trustee believes both tests independently, and together, substantially favor the transfer of these cases to the United States District Court for the Northern District of Texas.[2]

2.      As discussed herein, the Debtors' only connection to Delaware is that certain of the Debtors were formed under Delaware law.  Such a thin connection (particularly in comparison to the overwhelming connections to the Northern District of Texas), begs the question as to why the Debtors would choose to pursue a course of action as important as these restructuring cases so far away from the location of their headquarters, management, employees, customers, businesses, and assets.  The Debtors are likely to argue that Delaware would be more convenient for certain professionals located in the Northeastern part of the country.  Respectfully, the Trustee suggests such a consideration should have little (if any) bearing.  Another reason for choosing Delaware may have been, regardless of the interests of creditors or the needs of the business, to select the venue most advantageous to implementation of the restructuring agenda favored by senior lenders and management.  Those driving the forum selection process may view it more likely this Court would, among other things, adopt, without

---

[2]      Presumably, upon transfer of these cases to the Northern District of Texas, they would then be referred to the United States Bankruptcy Court for the Northern District of Texas.  <u>See</u> United States District Court for the Northern District of Texas Standing Order of Reference of Bankruptcy Cases and Proceedings, dated August 3, 1984.  Upon information and belief, the Trustee believes the Debtors' cases may be properly assigned to either the Dallas Division or Fort Worth Division within the Northern District of Texas.

significant additional scrutiny, a "market valuation" based on current distressed trading prices of the Debtors' debt securities.  The Trustee believes such strategic motives do not justify the significant expense, upheaval, and business disruption that would inevitably accompany maintaining these important cases in this district.

3.      The facts and circumstances of these cases make clear that transfer to the Northern District of Texas would benefit substantially all parties in interest other than, perhaps, professionals or senior lenders based in the Northeast, who would incur modest additional travel burdens.  The Debtors' headquarters, located at Energy Plaza in Dallas, Texas, are within walking distance of the Dallas division of the United States Bankruptcy Court for the Northern District of Texas.  By comparison, if these cases remain in Delaware, critical management personnel will be required to spend extended periods away from their offices when they should be focused on addressing business issues critical to maximizing value for all creditors (not just senior lenders with whom management has elected to negotiate).

4.      The Debtors have substantially all of their assets, employees, customers, and trade creditors in Texas (in the Dallas/Fort Worth area in particular).  The Debtors are the largest provider of electric power in North Texas, are subject to numerous Texas regulatory regimes, have litigated (and continue to litigate) often in Texas courts, and have potentially significant environmental clean-up obligations in Texas, which have come under increasing scrutiny in recent months by regulators and Texas citizen watch groups.  The Debtors' only arguable nexus to Delaware is that certain of the Debtors were formed as Delaware entities.  Upon information and belief, none of the Debtors has ever done business in Delaware; none of the Debtors' employees resides in Delaware; few, if any, of the Debtors' books and records are in Delaware; few, if any, of the Debtors' officers or directors are in Delaware; and Delaware has little, if any,

interest in the Debtors' operations or these cases.  In short, when the relevant factors are considered, substantially all strongly favor the transfer of these cases to the Northern District of Texas.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

5.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C § 157(b) and may be determined by the Bankruptcy Court.  For purposes of a hearing on this Motion, venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for relief sought herein are 28 U.S.C. § 1412, Bankruptcy Rule 1014 and Section 105(a) of the Bankruptcy Code.

## BACKGROUND

6.     The Debtors are headquartered at Energy Plaza in Dallas, Texas, which is approximately 0.4 miles (estimated to be a 9 minute walk) from the Bankruptcy Court in Dallas, Texas.  By contrast, Energy Plaza, where substantially all of the Debtors' key management members are located, is approximately 1,436 miles from the Bankruptcy Court in Wilmington, Delaware.  At a minimum, this involves a 30-minute ride from Energy Plaza to Dallas/Fort Worth International Airport, approximately three hours flying time to Philadelphia International Airport, and a 30-minute car ride from Philadelphia International to Wilmington, Delaware.  The foregoing does not take into account recommended early arrival times at airports for check-in, flight delays, traffic, or the need for overnight stays in Wilmington.

7.     The Debtors' corporate forms include corporations and limited liability companies formed in both Texas and Delaware.  The Debtors' corporate family includes the following entities:



In April 2013, Energy Future Competitive Holdings Company, a Texas corporation and the immediate corporate parent of TCEH, was converted to Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company.

**A.    The Debtors' Operations And Customers Are All In Texas.**

8.      EFH, the parent entity of the affiliated Debtors, is a Dallas, Texas-based energy company with a portfolio of competitive and regulated energy businesses in Texas, employing approximately 9,100 full-time employees, as of December 31, 2012, of whom approximately 2,840 are under collective bargaining agreements.  See EFH, Annual Report (Form 10-K) (Feb. 19, 2013) ("EFH 10-K") (**Appendix A**), at 1, 2.  EFH conducts its operations principally through its TCEH and Oncor subsidiaries.  See id. at 1.  TCEH, through its subsidiaries, is engaged in competitive electricity market activities in Texas including electricity generation, wholesale

energy sales and purchases, commodity risk management and trading activities, and retail electricity sales.  See id.  Additionally, the Debtors are one of the largest purchasers of wind-generated electricity in Texas.  See id. at 1, 7.  Their total wind power portfolio exceeds 900 MW, with projects involving transmission lines and power stations throughout Texas servicing the state.  See id. at 14, 51.

9.      The Debtors operate primarily within the Electric Reliability Council of Texas ("ERCOT") market, whose members provide approximately 85% of the electricity consumed in Texas.  See id. at 2.  ERCOT is governed by a board of directors and subject to oversight by the Public Utility Commission of Texas (the "PUCT") and the Texas Legislature, and its reliability standards are enforced by Texas Reliability Entity, Inc.[3]    See About ERCOT, http://www.ercot.com/about/ (last visited March 25, 2014) (**Appendix B**); EFH 10-K (**Appendix A**), at 8.  Concentrated in Texas, ERCOT and its members have "limited interconnections to other markets in the US and Mexico[.]"  EFH 10-K (**Appendix A**), at 3.  Additionally, the Debtors play a vital role in the ERCOT market, assisting ERCOT in its operations, as well as working in concert with other ERCOT utilities to obtain regulatory approvals for, as well as plan, design, and construct, new transmission lines in order to remove existing constraints on the ERCOT transmission grid.  See id. at 2.

10.      The Debtors' stated growth strategies are focused almost entirely on the Texas and ERCOT markets, and on improving their respective positions within those markets.  See id. at 3-4 (committing to "[b]eing an integral part of the communities in which we live, work and

---

[3]      Texas Reliability Entity, Inc. is the Federal Energy Regulatory Commission-approved "Regional Entity" for the ERCOT region, as authorized by the Energy Policy Act of 2005.  It is authorized by the PUCT to investigate compliance with the ERCOT Protocols and Operating Guides, working with PUCT staff regarding any potential protocol violations.

serve"; "expect[ing] to pursue growth opportunities across our existing business lines, including" a focus on "generation development opportunities to help meet ERCOT's growing electricity needs over the longer term"; working with ERCOT "to develop policies and protocols that provide appropriate pricing signals" that encourage the development of new generation to meet rising demand within the ERCOT market; increasing the number of retail customers served through the ERCOT market; and investing in transmission and distribution "to meet the needs of the growing Texas market").   In the past five years alone, "Energy Future Holdings has spent more than $10 billion in investments across Texas for new projects and to improve [its] facilities."  <u>See</u> News Release, Energy Future Holdings Corporation, Luminant Response to Ongoing Environmental Activism Campaign (Aug. 28, 2013) (**Appendix C**).

11.     Through those investments and others, TCEH, through subsidiary TXU Energy, serves approximately 1.75 million residential and commercial retail electricity customers in Texas.  <u>See</u> EFH 10-K (**Appendix A**), at 8.   TXU Energy currently provides retail electric service to all areas of the ERCOT market open to competition, including the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas.  <u>See id.</u>  It is a licensed retail electric provider under the Texas Electric Choice Act and, as such, subject to the jurisdiction of the PUCT.  <u>See id.</u> at 8.

12.     TCEH has the largest generation fleet in Texas, and its continuing operation is critical to serving customers and maintaining orderly electric service.  In that regard, ERCOT is in the final phases of a complex multi-year process to address generation resource adequacy and system reliability that will have major implications for TCEH, millions of electric customers, and system reliability.  TCEH has been and is expected to continue to be a major participant in those

significant ERCOT proceedings and the results of those proceedings will have a major impact on TCEH's future business and revenues.

13.     Additionally, Oncor, a subsidiary of EFH that operates the largest transmission and distribution system in Texas, is responsible for an electric transmission and distribution service territory that delivers electricity to more than 3.2 million homes and businesses and operates more than 119,000 miles of transmission and distribution lines.  See EFH 10-K (**Appendix A**), at 1.  Its transmission and distribution rates are regulated by the PUCT.  See id. at 9.  In particular, it is subject to detailed "ring fencing" provisions and other PUCT regulations by which the PUCT must review and approve any significant restructuring activities that may involve a change of control, debt incurrence, and/or dividend policies so as to protect the interests of millions of Texas electric ratepayers.

**B.     Texas Regulators Have A Direct Interest And Will Have An Active Role In These Cases.**

14.     The Debtors are subject to a number of Texas state regulatory schemes, and Texas regulators and authorities will have myriad interests in these cases.  For example, in the Debtors' April 15, 2014 Form 8-K filing, the Debtors noted the potential material impact of actions by, inter alia, the Texas Legislature, the Governor of Texas, the Texas Reliability Entity, Inc., the PUCT, the Railroad Commission of Texas (the "RRC"), and the Texas Commission on Environmental Quality.  See Energy Future Holdings Corporation April 15, 2014 Form 8-K (Cautionary Statement Regarding Forward-Looking Statements).  Actions by these parties could be expected to affect the Debtors' allowable pricing scheme, allowed rates of return, permitted capital structure, rate structure, operations of the Debtors' production facilities, operations of the Debtors' coal mines necessary to fuel certain of their plants, and/or acquisition or disposal of assets or facilities, or decommissioning of assets.  See id.

15.     In particular, as a Texas utility, the Debtors are regulated by, among others, the PUCT, whose rules "establish robust oversight, certain limits and a framework for wholesale power pricing and market behavior."  See EFH 10-K (**Appendix A**), at 9.  The Debtors are also subject to the requirements of the ERCOT Protocols, including Nodal Protocols and ERCOT reliability standards adopted and enforced by, among others, the Texas Reliability Entity, Inc. See id. at 10.  In fact, given the centralization of operations in Texas, certain of the Debtors and their affiliates are governed solely by Texas regulatory authorities, and are not subject to federal oversight.  See id. at 11 ("As its operations are wholly within Texas, Oncor is not a public utility as defined in the Federal Power Act and, as a result, it is not subject to general regulation under the Act.").  The above Texas regulatory bodies will certainly be actively interested and involved in the Chapter 11 Cases.

16.     In addition to general environmental oversight by the Texas Commission on Environmental Quality,[4] the Debtors are also subject to regulatory oversight by the RRC. Luminant Generation Company LLC ("Luminant Generating"), a subsidiary of TCEH, is the third-party guarantor of Luminant Mining Company LLC's ("Luminant Mining") self-bond for certain coal mine sites in Texas.  The self-bond assures performance of certain environmental remediation obligations of Luminant Mining (estimated to range between $850 million to $1.1 billion in EFH's November 1, 2013 10-Q), which arise under and are governed by, among other statutory regimes, title 16 of the Texas Administrative Code (the "TAC").  Pursuant to TAC

---

[4]     Among other matters potentially affecting the Debtors, the Texas Commission on Environmental Quality is currently considering a petition seeking adoption and implementation of rules to limit emissions at three of the Debtors' large coal-fired generation facilities in North Texas.  See Dallas County Medical Society, Physicians Petition the State to Require EFH's Legacy Coal-Fired Power Plants to Reduce Emissions to Current Standards to Protect Health of North Texans (Aug. 28, 2013) (**Appendix D**), http://www.dallas-cms.org/news/dcms_petitionTCEQ_final.pdf.

Section 12.314(b), the RRC, which is charged with, among other things, monitoring compliance with the conditions of such bonds, may, inter alia: (a) increase the required amount of the Debtors' bonding obligations, see § 16 TAC 12.307(a) & (d); (b) require the Debtors to post bonds in addition to, or in replacement of, the current self-bond, and prohibit the Debtors from continuing mining operations until such new bond is in place, see § 16 TAC 12.309(j)(7); (c) forfeit all or part of a bond if "the operator defaults on the conditions under which the bond was posted" see 16 TAC § 12.314(b); and/or (d) through the office of the Texas Attorney General, commence an action in Texas state court against the Debtors in order to compel their compliance with RRC orders, see Texas Gov't Code § 2001.202 and 16 TAC § 12.309(j)(5)(E).   As the Debtors' note, in the event of a default under the self-bond, "TCEH may be required to post cash, letters of credit or other tangible assets as collateral support in the amount currently estimated to be approximately $850 million or $1.1 billion."   EFH 10-K (**Appendix A**), at 35.   The Debtors may therefore face additional (and substantial) liability to certain Texas agencies in the event the RRC exercises any rights it may have to forfeit the self-bond to which the Debtors are a party, and there is no question that the RRC will be an important case participant.

17.     Accordingly, applicable Texas regulatory, legislative, and executive bodies will be vitally interested in these reorganization proceedings, and their express regulatory approval may be required for any ultimate plan or plans that may be proposed.   Presumably, such parties will take the position that their respective regulatory actions are exempted from the automatic stay, and may proceed apace in Texas notwithstanding the filing of these Chapter 11 cases.

### C.     Litigants With Potentially Significant Claims In Texas Have An Interest In These Proceedings.

18.     The Debtors are also involved in a number of lawsuits involving employment, commercial, and environmental issues, and other claims for injuries and damages, among other

matters.  See EFH 10-K (**Appendix A**), at 33.  Of the over 200 proceedings in which the Debtors have been a party since 2012, approximately 95% are (or were) being litigated in state and federal courts across Texas, including certain cases alleging environmental liability.  Of those cases being litigated in Texas state courts, nearly all have been brought in Dallas County.  Not a single case over that period involved Delaware state or federal courts.  Attached hereto as Exhibit B is a chart depicting the legal proceedings to which the Debtors have been a party since 2012.

>        **D.**      **Delaware Has Nominal Connections With These Debtors.**

19.      In contrast to the Debtors' deep Texas roots, the Debtors' connection to Delaware is nominal.  Upon information and belief: a) the Debtors do not have any employees, assets, or operations in Delaware; b) the Debtors do not conduct business in, or provide any services to, Delaware; c) the Debtors are not subject to any Delaware regulatory oversight; and d) none of the Debtors' books, records, officers, or directors are located in Delaware.  Even those entities incorporated in Delaware, along with those corporations and limited liability companies incorporated in Texas, are all headquartered in Dallas, Texas.[5]

>                        **RELIEF REQUESTED**

20.      By this Motion, the Trustee requests entry of an Order, substantially in the form attached hereto as Exhibit A, transferring these Chapter 11 Cases to the United States District Court for the Northern District of Texas in the interest of justice and/or for the convenience of

---

[5]      TCEH, EFCH, Energy Future Intermediate Holdings Company LLC ("EFIH"), and Oncor Electric Delivery Company ("Oncor") are organized as Delaware limited liability companies.  Parent company EFH is a Texas corporation, and Luminant Generation Company LLC ("Luminant") and TXU Energy Retail Company LLC ("TXU Energy") are organized as Texas limited liability companies.  As noted above, until April 2013, EFCH was a Texas corporation.

the parties, pursuant to 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Section 105(a)

of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

21.     Section 1408 of title 28 of the United States Code sets forth the venues in which a

case brought under title 11 may be commenced.  That provision provides:

> Except as provided in section 1410 of this title [pertaining to cases ancillary to foreign proceedings], a case under title 11 may be commenced in the district court for the district—
>
>> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or
>>
>> (2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408.  Similarly, Bankruptcy Rule 1014 provides:

> If a petition is filed in the proper district, the court, on the timely motion of a party in interest or on its own motion, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, may transfer the case to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.

Fed. R. Bankr. P. 1014.

22.     Where venue is proper in multiple districts under Section 1408, a party-in-interest

may seek to have the case transferred to another proper venue.  See 28 U.S.C. § 1412 ("A district

court may transfer a case or proceeding under title 11 to a district court for another district, in the

interest of justice or for the convenience of the parties."); see also In re Statewide Theatres

Corp., 4 F. Supp. 86, 87 (D. Del. 1933) (finding expansive standing for parties to challenge

venue when noting "'parties in interest' include not only general unsecured creditors but secured

creditors, the bankrupt, and *every other party whose pecuniary interest is affected* by the proceedings") (emphasis added).

23.     The Court is authorized to transfer venue for a chapter 11 case where: a) the transfer is in the interest of justice; <u>or</u> (b) for the convenience of the parties.  <u>See</u> 28 U.S.C. § 1412; <u>see also</u> <u>The Paul H. Shield, MD, Inc. Profit Sharing Plan v. Northfield Labs. Inc. (In re Northfield Labs. Inc.)</u>, 467 B.R. 582, 590 (Bankr. D. Del. 2010) (BLS) ("Section 1412 is phrased in the disjunctive and a proceeding is subject to transfer upon a sufficient showing that either the interest of justice or the convenience of the parties is met."); <u>In re LaGuardia Assocs., L.P.</u>, 316 B.R. 832, 837 (Bankr. E.D. Pa. 2004) ("It has been observed that § 1412 is [ ] written in the disjunctive, making transfer of venue appropriate *either* in the interest of justice *or* for the convenience of parties, and that statutory provision creates two distinct analytical bases upon which transfer of venue may be grounded.") (citation omitted) (emphasis in the original).

24.     Here, both prongs of this disjunctive test are satisfied.  The Debtors are headquartered and centralized in the Dallas/Fort Worth area, where bankruptcy cases are administered by the United States Bankruptcy Court for the Northern District of Texas.  The Debtors' connections to Delaware do not extend beyond paper.  The Debtors' primary trade creditors, all of their customers, as well as the concentration of their assets, are located in Texas. The United States Bankruptcy Court for the Northern District of Texas is as well-suited, or better-suited, to handle the numerous Texas-specific issues that will inevitably arise in these cases given the integral role the Debtors play in one of Texas' largest economic centers, the Texas regulatory regimes to which the Debtors are subject, and the interests of the State of Texas and millions of Texas electric customers in the Debtors' restructuring effort.

25.     Delaware courts will consider a host of factors, weighing those factors differently based on the facts and circumstances of each case: (1) plaintiff's original choice of forum; (2) defendant's forum preference; (3) whether the claim arose elsewhere; (4) location of books and records and/or the possibility of viewing premises, if applicable; (5) convenience of the parties as indicated by their relative physical and financial condition; (6) convenience of the witnesses; (7) enforceability of the judgment; (8) practical considerations that would make the trial easy, expeditious, or inexpensive; (9) the relative administrative difficulty in the two <u>fora</u> resulting from congestion of the courts' dockets; (10) the public policies of the <u>fora</u>; (11) the familiarity of the judge with the applicable state law; and (12) the local interest in deciding local controversies at home.  <u>See</u> <u>Zazzali v. 1031 Exch. Grp. (In re DBSI, Inc.)</u>, 478 B.R. 192, 194-95 (Bankr. D. Del. 2012); <u>see also</u> <u>Jumara v. State Farm Ins. Co.</u>, 55 F.3d 873, 879 (3d Cir. 1995) (listing factors within the context of 28 U.S.C. § 1404(a)); <u>In re Innovative Commc'n Co., LLC</u>, 358 B.R. 120, 126-27 (Bankr. D. Del. 2006) (holding the <u>Jumara</u> factors relevant to transfers of venue in the context of section 1412).  In addition, courts also have "discretion to consider other private and public interest factors."  <u>In re Qualteq, Inc.</u>, No. 11-12572, 2012 WL 527669, at *5 (Bankr. D. Del. Feb. 16, 2012) (KJC).  Considered both individually and collectively, these factors overwhelmingly weigh in favor of granting the relief requested in the Motion.

A.      **Transferring The Chapter 11 Cases To The United States District Court For The Northern District Of Texas Would Be In The Interest Of Justice.**

26.     Of the host of factors considered by courts, "[i]t is oft-repeated that the factor accorded the most weight is promotion of the economic and efficient administration of the estate."  <u>Id.</u>, at *6; <u>see</u> <u>DBSI</u>, 478 B.R. at 198 (noting that the forum in which the debtor has its primary operations is favored); <u>DHP Holdings II Corp. v. The Home Depot, Inc. (In re DHP</u>

Holdings II Corp.), 435 B.R. 264, 275 (Bankr. D. Del. 2010) (transferring venue after noting that "[u]ltimately, however, the most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate") (citation and quotations omitted).  Promotion of the economic and efficient administration of the estate is also the central factor considered when evaluating the interest of justice.  See Qualteq, 2012 WL 527669, at *6; see Laguardia Assocs., 316 B.R. at 837 ("[T]he 'interest of justice' component of § 1412 is a broad and flexible standard which must be applied on a case-by-case basis.  It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness. . . .") (quoting Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1391 (2d Cir. 1990)); see also Northfield Labs., 467 B.R. at 590 (listing the factors typically considered in relation to the "interests of justice" test to "include: (i) whether transfer promotes the economic and efficient administration of the bankruptcy estate; (ii) whether transfer facilitates judicial efficiency; (iii) whether the parties will receive a fair trial in either venue; (iv) whether either forum has an interest in deciding the controversy; (v) whether transfer would affect enforceability of any judgment rendered; and (vi) whether the plaintiff's original choice of forum should be disturbed").  In applying this test, a court "must consider what will promote the efficient administration of the estate, judicial economy, timeliness and fairness."  Qualteq, 2012 WL 527669, at *6 (citation omitted).

27.    At bottom, efficiency and fairness dictate that these Chapter 11 Cases be transferred to the Northern District of Texas.  From an efficiency point of view, transferring these cases to the Northern District of Texas will allow key members of management to continue doing their jobs, which is critical for value preservation, rather than spending extended time

traveling to and from Delaware where they will be far less productive. The Fifth Circuit recognized the importance of centralizing restructuring efforts around a management team during the restructuring process in the seminal case of Commonwealth of Puerto Rico v. Commonwealth Oil Refinery Co. (In re Commonwealth Oil Refinery Co.), 596 F.2d 1239 (5th Cir. 1979) ("CORCO"):

> On the efficiency side, San Antonio is clearly the favored district. The heart of the Chapter XI proceeding is working up a financial plan of arrangement acceptable to all the parties. The people charged with this responsibility in [the debtor's] management are all located in San Antonio.

Id. at 1247. In addition, given the location and nature of the Debtors' assets, substantially all of which are located in Texas, most material witnesses will be located in Texas, a fact that weighs heavily in favor of transferring these cases to the Northern District of Texas. See In re Lakota Canyon Ranch Dev., LLC, No. 11-03739-8, 2011 WL 5909630, at *3 (Bankr. E.D.N.C. June 21, 2011) (transferring cases to Colorado after determining, among other things, that "[b]ecause of the location and nature of the Debtor's assets, the appraisers, and real estate sales experts will most likely be from Colorado" and so the estate and secured lenders should not have to bear the cost of transporting those witnesses, especially where the only material witness living in the jurisdiction where the debtors filed was the member/manager of the Debtor's limited liability company). That those controlling the venue decision would choose Delaware, with its attendant need for key management personnel and witnesses to be distanced from the locations where they work and live, begs the question of what motive drove the venue decision in these cases.

28.    While certain professionals based in the Northeast and/or lenders (including the Trustee and the Second Liens) may have to travel farther, or participate telephonically, such is of little moment if the goal is to maximize estate value and appropriately restructure the Debtors. In a recent decision to transfer venue to Texas, this Court recognized that advances in technology

create a "relative measure of seamlessness" between professionals, regardless of their proximity to the proceeding. See Transcript of Oral Argument at 86:18-87:3, In re Goldking Holdings, LLC, No. 13-12820 (BLS) (Bankr. D. Del. Nov. 20, 2013) (**Appendix E**). The same is true of any secured lenders residing in the Northeast. See Transcript of Oral Argument at 76:22-77:2, In re DesignLine Corp., No. 13-12089 (Bankr. D. Del. Sept. 4, 2013) (**Appendix F**) ("[I]t is important to make sure the unsecureds participate in the case to assure that everything [is] just not railroaded through based on an assumption that the secured creditors are the only ones with an interest").

29.     As to fairness, there is certainly nothing unfair about transferring these cases to a venue in which state regulators, employees, customers, trade creditors, and numerous other parties in interest may participate in the restructuring process. The Debtors are centralized in a venue, the Northern District of Texas, that is well-positioned to handle these cases and readily accessible to all parties in interest. The decision to file these cases so far from the location of the Debtors' businesses raises the specter of forum shopping to effect a particular restructuring goal.

30.     Moreover, EFH, as the parent of the Debtor entities, is a Texas corporation based in Dallas, Texas and employing approximately 9,100 full-time employees (substantially all in Texas). TCEH's approximately 1.75 million residential and commercial retail electricity customers, who have a vested interest in the outcome of these Chapter 11 Cases, live across the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas. Nearly all, if not all, of the Debtors' substantial assets are located in Texas, and nearly all of the essential parties to the Debtors' restructuring reside in Texas, including numerous trade creditors and the Debtors' key executives. Moreover, those Texas regulatory bodies, including the PUCT, ERCOT, and the RRC, which are vitally interested in these Chapter 11 Cases, and, in some

cases, may have critical regulatory approval rights in connection with an ultimate plan of reorganization, are obviously based in Texas. One of the members of the Debtors' Sponsor Group, TPG Capital, is headquartered in Fort Worth, Texas, which is within the Northern District of Texas.  Transferring the Chapter 11 Cases to the Northern District of Texas, where the material parties to the restructuring are located, would promote the economic and efficient administration of the estate, a factor Delaware courts have recognized as the one "accorded the most weight." Qualteq, 2012 WL 527669, at *6.

31.    The other factors courts consider are similarly satisfied here.  The Delaware bankruptcy docket is significantly more congested than that of the Northern District of Texas, meaning the requested transfer would promote judicial efficiency.  See In re Apple, Inc., 602 F.3d 909, 915 (8th Cir. 2010) ("Docket congestion is a permissible factor to consider . . . ."); Gro Master, Inc. v. Farmweld, Inc., 920 F. Supp. 2d 974, 993 (N.D. Iowa 2013) ("Factors that the court has found are frequently relevant to the 'interests of justice' issue include . . . comparative congestion of dockets.").  For the 12-month period ended December 31, 2013, there were 807 chapter 11 cases filed in this Court, compared with the 233 chapter 11 cases filed in the Northern District of Texas.  See U.S. Bankruptcy Courts – Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending Dec. 31, 2013, http://www.uscourts.gov/uscourts/Statistics/BankruptcyStatistics/BankruptcyFilings/2013/1213_ f2.pdf (last visited March 30, 2014) (**Appendix H**).  The six judges sitting in the Bankruptcy Court for the District of Delaware either were or are, on average, responsible for approximately 134.5 chapter 11 cases each in that 12-month period; the six judges sitting in the Northern District of Texas were or are, on average, each responsible for 38.8 chapter 11 cases during the same period.

32.     The effect of transfer on the ability for the parties to receive a fair trial is, at best, neutral.  While the Trustee is confident both courts would fairly apply the uniform laws of the federal Bankruptcy Code, a Texas bankruptcy court will have experience applying the myriad Texas state laws that will arise in these cases.  Also, based on the Debtors' integration into the State of Texas, including both the state's economy and the continued development of the state's energy market, Texas is the forum that has a clear interest in adjudicating the Chapter 11 Cases.  See Northfield Labs., 467 B.R. at 590 (granting a motion to transfer venue after determining, inter alia, that the venue to which the movant sought to transfer the case had "an interest in deciding the controversy . . . that relates to occurrences within its jurisdiction").  Ultimately, the Debtors' deep Texas roots favor the transfer of venue, since there is a "local interest in deciding local controversies at home."  In re Amendt, 169 F. App'x 93, 97 (3d Cir. 2006) (citation and quotations omitted).

33.     Texas is also the forum for nearly all of the Debtors' pending state and federal litigation.  The Debtors are involved "in a number of lawsuits involving employment, commercial, and environmental issues, and other claims for injuries and damages, among other matters."  EFH 10-K (**Appendix A**), at 33.  Of the over 200 proceedings in which the Debtors have been a party since 2012, approximately 95% are being or were litigated in state and federal courts across Texas, including certain cases alleging environmental liability.  Of those cases being litigated in Texas State courts, nearly all have been brought in Dallas County.  No cases are being litigated in Delaware state or federal courts.

34.     To the extent those claims pending in other Texas state and federal courts may affect the *res* of the estate, the interest of justice favors the transfer and consolidation of those cases.  See Brown v. Wells Fargo, N.A., 463 B.R. 332 (M.D.N.C. 2011) (granting motion to

transfer venue after determining that the interest of justice strongly favors transfer if pending claims can be tried "concurrently with [a debtor's] bankruptcy proceedings" because that "would promote the economic and efficient administration of the bankruptcy estate") (citation and internal quotations omitted); Doss v. Chrysler Grp., LLC, No. 09-02130, 2009 WL 4730932, at *5 (D. Az. 2009) (transferring case after noting that "cases should be transferred to districts where related actions are pending") (citation and quotations omitted).  The need to transfer the bankruptcy to the forum where pending actions exist may be particularly acute where the debtor is subject to environmental liability in its home forum.  See, e.g., In re Standard Tank Cleaning Corp., 122 B.R. 174 (Bankr. E.D.N.Y. 1990) (granting motion to transfer venue to District of New Jersey where a majority of debtor's creditors resided and debtor was party to an action for environmental liability); see also Doehler-Jarvis Ltd. P'ship v. U.S. Die Casting & Dev. Co., No. 92-2206, 1993 WL 96528, at *2 (N.D. Ill. Mar. 31, 1993) (granting motion to transfer venue where there were existing lawsuits in the transferee forum rooted in environmental liability after noting that the "existence of related litigation in the transferee court strongly supports a motion to transfer").

35.    There is litigation pending in both Texas state and federal courts that, depending on the outcome, may affect the size of the Debtors' estate and, ultimately, recoveries for the largely Texas-based body of trade creditors.   Also, the Debtors may have liability to the State of Texas in excess of $1 billion in the event certain conditions are satisfied that prompt the Railroad Commission of Texas to forfeit the self-bond to which the Debtors are a party.

36.    The Railroad Commission of Texas is but one of a number of the Texas state agencies that have an interest in the outcome of these Chapter 11 Cases. The Debtors are deeply involved in the ERCOT market, which is heavily regulated by the PUCT and the Texas

Legislature.  ERCOT is in the final phases of a complex multi-year proceeding to address generation resource adequacy and system reliability that will have major implications for TCEH, millions of electric customers, and system reliability.  TCEH has been and will continue to be a major participant in those significant ERCOT proceedings

37.    The PUCT also regulates the transmission and distribution rates of Oncor, a subsidiary that operates the largest transmission and distribution system in Texas.  Oncor is subject to detailed "ring fencing" provisions and other PUCT regulations by which the PUCT must review and approve any significant restructuring activities that may involve a change of control, debt incurrence, and/or dividend policies so as to protect the interests of millions of Texas electric ratepayers.  Thus, the PUCT will necessarily be involved in these Chapter 11 Cases and may even have critical regulatory approval rights over an ultimate plan of reorganization.

38.    Proactive participation by such entities in a positive restructuring outcome of the Debtors' estates would likely be materially advanced if the cases were transferred to the Northern District of Texas.  Indeed, Moody's Investor Services has commented that EFH "[p]ursuing bankruptcy is a credit negative because it heightens the risk of regulatory intervention."  Moody's Investor Services, <u>Energy Future Holdings' Restructuring Would Risk Regulatory Intervention, A Credit Negative</u> (Aug. 8, 2013) (**Appendix G**).  "[T]he closer [EFH's] bankruptcies get to Oncor," EFH's regulated utility unit, "the higher the likelihood for political intervention and regulatory scrutiny over the bankruptcy restructuring process."  <u>Id.</u>

39.    While the Debtors' venue choice may be given some weight, all of the remaining relevant factors overwhelmingly favor transfer.  Accordingly, the "Court [should] accord [ ] little weight to [the Debtors'] chosen forum . . . ."  <u>Northfield Labs.</u>, 467 B.R. at 591; <u>see</u> <u>Clark v.</u>

Chrysler Grp., LLC, No. 10-3030, 2010 WL 4486927, at *9 (Bankr. E.D. Pa. Nov. 5, 2010) ("consider[ing] Plaintiff's choice of forum and the convenience afforded to Plaintiff in allowing the parties to litigate the matter in Pennsylvania" but nevertheless transferring the action to the Bankruptcy Court for the Southern District of New York because plaintiff's choice of forum was "outweighed by" those factors that promoted venue transfer in the interest of justice and for the convenience of the parties); Doehler-Jarvis, 1993 WL 96528, at *2 (noting that "[s]ome deference must be given" to plaintiff's forum choice, but, where "nearly every other factor which enters into the transfer of venue equation favors" transfer, the court will transfer venue); In re Ocean Props. of Del., Inc., 95 B.R. 304, 305 (Bankr. D. Del. 1988) (granting motion to transfer venue after explaining that, although "the debtor's choice of forum is entitled to 'great weight'" where venue is proper, a venue transfer motion "requires balancing this factor with several others," including "the proximity of the court to interested parties as well as the location of assets, the economics of administering the estate and the relative economic harm to debtor and other interested parties").  Furthermore, this Court has categorically rejected the position that Delaware is *per se* a superior jurisdiction for restructuring.  See, e.g., Transcript of Oral Argument at 67:18-68:6, In re Goldking Holdings, LLC, No. 13-12820 (BLS) (Bankr. D. Del. Nov. 20, 2013) (**Appendix E**) (noting that the Court had previously "categorically reject[ed] the idea that . . . this Court, because of its experience, is a better forum"); Transcript of Oral Argument at 187:24-188:2, In re Qualteq, No. 11-12572 (KJC) (Bankr. D. Del. Dec. 16, 2011) ("refus[ing] to accept t[he] proposition . . . that . . . a debtor has a much better chance of a successful reorganization here than in other places") (**Appendix I**).

40.    Additionally, an element of judicial economy is whether either court has an advantage on the "learning curve" relevant to the case.  See In re EB Capital Mgmt. LLC, No.

11-12646, 2011 WL 2838115, at *5-6 (Bankr. S.D.N.Y. July 14, 2011) (granting motion to transfer venue after finding, inter alia, that "there has been no 'learning curve' in this case because this is the first motion pending before the Court").  Given the numerous Texas state law issues that will arise in these cases, and the experience of the bankruptcy bench in the Northern District of Texas in dealing with such issues, it is respectfully submitted that if any court has a shorter learning curve, it is the Bankruptcy Court in Texas.  In addition, as the Chapter 11 Cases were just commenced, this Court likely has not yet had the opportunity to familiarize itself with the complexities of the Debtors' financial affairs or business.  As such, in the interest of promoting judicial economy, the Trustee submits that these cases should be transferred to Texas as soon as possible to avoid unnecessary expenditures of this Court's time and resources.

41.     Moreover, the United States Bankruptcy Court for the Northern District of Texas is the local court for the Debtors, their businesses, their customers, and the majority of their trade creditors.  These Chapter 11 Cases would benefit from being in "a venue where the judge presiding would more likely have active familiarity with the community and the milieu in which the [Debtors operate].  Such a judge would be in a much better position to gauge the likelihood of an effective reorganization."  In re B.L. of Miami, Inc., 294 B.R. 325, 332 (Bankr. D. Nev. 2003).  Although the Trustee is not suggesting that one court is superior to another in its ability to preside over these proceedings, it does note that the Bankruptcy Courts in Texas have prior experience in the conduct of chapter 11 proceedings involving debtors similar to these Debtors (including the adjudication of complex valuation issues such as will likely be present in the Debtors' cases).  See, e.g., In re Mirant Corp., Case No. 03-46590 (Bankr. N.D. Tex. 2003); see also In re El Paso Elec. Co., Case No. 92-10148 (Bankr. W.D. Tex. 1992).

42.    Considering all of the relevant factors, and focusing on promotion of the economic and efficient administration of the estate, which Delaware courts consider the most important factor in weighing the interest of justice, these cases should be transferred to the Northern District of Texas.

**B.    Convenience Of The Parties Strongly Favors Transferring The Chapter 11 Cases To The Northern District Of Texas.**

43.    While the Trustee believes the "interest of justice" test is satisfied and justifies transfer of the Debtors' cases to the Northern District of Texas, consideration of the "convenience of the parties" test provides an independent basis for transferring these Chapter 11 Cases to the Northern District of Texas.  When evaluating whether a transfer of venue would further the convenience of the parties, courts in this district typically consider: "(i) the location of the plaintiff and defendant; (ii) the ease of access to necessary evidence; (iii) the convenience of witnesses; (iii) the availability of subpoena power; and (iv) the expense of obtaining unwilling witnesses."  Northfield Labs., 467 B.R. at 591 (focusing on where the causes of action arose, the company's primary place of business, the location of the company's business records, and the location of the parties to the action when determining the "convenience of the parties"); see CORCO, 596 F.2d at 1242 (articulating what has been come to be known as the "CORCO factors"); Qualteq, 2012 WL 527669, at *6, n.8 (noting that courts have adopted the "wellworn 'six-factor' test" that considers (a) proximity of creditors of every kind to the court; (b) proximity of the debtor; (c) proximity of witnesses who are necessary to the administration of the estate; (d) the location of the debtor's assets; (e) the economic administration of the estate; and (f) the necessity for ancillary administration in the event of liquidation).

44.    Despite the Debtors having a corporate presence in Delaware, their headquarters, operations, and books and records exist almost exclusively in Texas, as do substantially all of

their assets and employees.  Nearly all of the Debtors' officers and executives, who will be necessary to any successful reorganization, reside and work in Texas.  Given their importance in the restructuring, it would be particularly onerous to require those officers to leave their home offices and travel from Texas to Delaware to participate in these Chapter 11 Cases.  But, even if they were required to travel to participate in these proceedings, the convenience of other interested parties is paramount.  See Ocean Props. of Del., 95 B.R. at 307 (granting motion to transfer venue after noting that, although a venue transfer may result in nominally higher costs for the debtors to administer their estates, "[t]he cost to Debtors is considerably less than the total cost other interested parties would have to incur to participate in these reorganizations").

45.    It appears that the only substantial creditors residing outside of Texas are certain of the Debtors' bondholders.  This Court recently noted that the location of a debtor's general unsecured creditors was more important when determining whether a particular venue was convenient for the parties.  See Transcript of Oral Argument at 76:22-77:2, In re DesignLine Corp., No. 13-12089 (Bankr. D. Del. Sept. 4, 2013) (**Appendix F**) (rejecting argument that convenience for secured lenders is of utmost importance and noting that "it is important to make sure the unsecureds participate in the case to assure that everything [is] just not railroaded through based on an assumption that the secured creditors are the only ones with an interest").  Furthermore, as a practical matter, and as this Court also noted, secured lenders are "in the best position to pay to go" to the state where the general unsecured, and typically not as well financed, creditors reside.  Id. at 77:7-11.[6]

---

[6]     Even giving due consideration to the convenience of those parties not residing in Texas, including certain of the Debtors' bondholders, there is little material difference between traveling from New York City to Wilmington, Delaware versus traveling from New York City to Dallas-Fort Worth International Airport.  Upon information and belief, the majority of parties who are not already located in Texas, as well as their counsel and

46.     That certain of the Debtors are incorporated in Delaware should bear little weight in determining the convenience of the parties.  See Innovative Commc'n, 358 B.R. at 127-28 (granting motion to transfer venue after weighing the interest of justice and convenience factors and explaining that "the place of incorporation is not the controlling factor" in the court's analysis); In re Ofia Realty Corp., 74 B.R. 574, 577 (Bankr. S.D.N.Y. 1987) (granting motion to transfer after finding that the debtor's only connection to New York was its corporate registration and the residence of the debtor's sole shareholder and president, meaning Texas was the proper venue, since its "managing agent, its assets and its creditors are located [in Dallas] and [that is] where its business transactions were conducted").

47.     As previously stated, the Debtors are party to a number of pending lawsuits, nearly all of which are being litigated in state and federal courts in Texas.   Given that substantially all of the Debtors' operations, books and records, assets, and employees are located in Texas, the convenience of the parties weighs in favor of transferring these Chapter 11 Cases to the Debtors' home state, where parties to the pending actions can participate in the bankruptcy proceedings.  See Northfield Labs., 467 B.R. at 590 (determining that convenience of the parties is best served by trying cases in the forum where the alleged misconduct giving rise to those claims occurred, especially where a number of parties to the proceedings were residents of that forum, the defendant's principal place of business and business records were located there, and many of the defendants were present in that forum); In re Cont'l Airlines, Inc., 133 B.R. 585,

---

representatives, reside in the New York City area, not Delaware.  Requiring those well-funded parties to travel three (3) hours by plane to Texas, rather than 1 1/2 hours by train to Delaware, is not overly burdensome in light of the location of most trade creditors in or around the Northern District of Texas.  Accord Transcript of Oral Argument at 77:23-78:15, In re DesignLine Corp., No. 13-12089 (Bankr. D. Del. Sept. 4, 2013) (**Appendix F**) (determining that there was no material difference between North Carolina and Delaware for the travel times of secured lenders and the debtor's professionals residing in New York City and Atlanta).

588 (Bankr. D. Del. 1991) (considering the "inconvenience and additional expense in defending [a] suit in a distant forum" as factors favoring venue transfer).

48.     Based on the location of the Debtors' assets, principal place of business, executives, employees, customers, books and records, potential witnesses, regulators, and trade creditors, the convenience of the parties overwhelmingly favors granting the relief requested in this Motion.

<u>**NO PRIOR REQUEST**</u>

49.     No prior motion for the relief requested herein has been made to this Court or any other court.

<u>**NOTICE**</u>

50.     Notice of this Motion has been given to (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) the Debtors' postpetition lenders; and (d) parties who have filed notices of appearance.  The Trustee respectfully submits that no other or further notice need be given.

<u>**CONCLUSION**</u>

**WHEREFORE**, for the reasons stated herein, the Trustee respectfully requests that this Court enter an Order, pursuant to 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Section 105(a) of the Bankruptcy Code, substantially in the form attached hereto as <u>Exhibit A</u>: (i) transferring these Chapter 11 Cases to the United States District Court for the Northern District of Texas; and (ii) granting the Trustee such other and further relief as this Court may deem just and proper.

Dated: April 29, 2014
      Wilmington, Delaware

*/s/William P. Bowden*
ASHBY & GEDDES, P.A.
William P. Bowden [I.D. #2553]
Gregory A. Taylor [I.D. #4008]
500 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

- and -

BROWN RUDNICK LLP
Edward S. Weisfelner (pro hac vice pending)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and -

Jeffrey L. Jonas (pro hac vice pending)
Andrew P. Strehle (pro hac vice pending)
Jeremy B. Coffey (pro hac vice pending)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

- and -

Howard L. Siegel (pro hac vice pending)
185 Asylum Street
Hartford, CT 06103
Telephone: (860) 509-6500
Facsimile: (860) 509-6501

*Counsel to Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee for the Second Liens*